MARK J. BOURASSA, ESQ. (NBN 7999)
JENNIFER A. FORNETTI, ESQ. (NBN 7644)
VALERIE S. CHRISTIAN ESQ. (NBN 14716)
**THE BOURASSA LAW GROUP**
2350 W. Charleston Blvd., Suite 100
Las Vegas, Nevada 89102
Telephone:    (702) 851-2180
Facsimile:    (702) 851-2189
Email:        *mbourassa@blgwins.com*
              *jfornetti@blgwins.com*
              *vchristian@blgwins.com*

David S. Almeida (pro hac vice forthcoming)
Matthew J. Langley, (pro hac vice forthcoming)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 312-576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com

*Attorneys for Plaintiff & the Classes*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SARITA LUNDIN, *individually and on behalf of all others similarly situated,* | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| FERTILITY CENTER OF LAS VEGAS - SHAPIRO, MD, PLLC | |
| Defendant. | |

1

**CLASS ACTION COMPLAINT**

**CLASS ACTION COMPLAINT**

Plaintiff Sarita Lundin ("Plaintiff") brings this class action lawsuit, individually and on behalf of all others similarly situated (the "Class Members"), against Fertility Center of Las Vegas – Shapiro, MD, PLLC ("FCLV" or "Defendant"). The allegations set forth herein are based on Plaintiff's personal knowledge and on information and good faith belief as to all other matters based upon investigation by counsel.

**INTRODUCTION**

1.      One in eight couples has trouble getting pregnant or carrying a pregnancy, and 7.4 million women have received infertility treatment.[1] Despite the prevalence of infertility, information concerning fertility and reproductive health is among the most confidential and sensitive information in our society. According to a recent study, most infertile women choose to keep their struggle private from family or friends.[2]

2.      Regarding the need to keep information about reproductive health private, the Department of Health and Human Services ("HHS") has noted:

> A positive, trusting relationship between individuals and their health care providers is essential to an individual's health and well-being. The prospect of releasing highly sensitive PHI can result in medical mistrust and the deterioration of the confidential, safe environment that is necessary to quality health care, a functional health care system, and the public's health generally. That is even more true in the context of reproductive health care, given the potential for stigmatization and other adverse consequences to individuals resulting from disclosures they do not want or expect.[3]

---

[1]   *See How to Support Someone Experiencing Infertility*, https://www.nm.org/healthbeat/healthy-tips/emotional-health/How-to-Support-Someone-Experiencing-Infertility (last visited Feb. 28, 2024).

[2]   *See What to Say to Someone Struggling With Infertility*, https://www.nytimes.com/2020/04/17/parenting/support-friend-infertility.html (last visited Feb. 28, 2024).

[3]   *See HIPAA Privacy Rule To Support Reproductive Health Care Privacy*, https://www.federalregister.gov/documents/2023/04/17/2023-07517/hipaa-privacy-rule-to-support-reproductive-health-care-privacy (last visited Feb. 28, 2024).

3.      The mishandling of such private and sensitive health information can have serious consequences including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[4]  Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical and fertility treatment which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

**_Defendant Collect a Significant Amount of Private Information_**

4.      Founded in 1988, Defendant FCLV, is "one of the leading fertility centers in the world . . . providing the most advanced fertility treatments available today."[5]

5.      FCLV, "the first infertility practice to open in southern Nevada." claims that its "brand represents our ongoing commitment to providing the most advanced fertility treatments available today with state-of-the-art science, technology, and research."[6]

6.      As part of the medical services it provides, FCLV owns, controls and maintains a website for its clinic, https://fertilitycenterlv.com/ (the "Website").

7.      Defendant FCLV actively encourages patients and prospective patients to use the Website, to communicate with their healthcare providers; manage medical appointments for fertility services; search medical conditions concerning fertility and treatment options. The Website invites patients to share and search for personal medical information about their own reproductive health. And patients, trusting that this extremely

---

[4] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."), https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Feb. 28, 2024).
[5] *See* https://fertilitycenterlv.com/about-us/ (last visited Feb. 28, 2024).
[6] *Id*.

3

**CLASS ACTION COMPLAINT**

private and sensitive information will be safeguarded, share intimate and personal medical information with FCLV through the Website.

8.     FCLV boldly proclaims to its patients in its "Privacy Policy" that "your privacy is important to us" and that it does "not share this information with outside parties."[7]

9.     As described in more detail below, those statements are false.

***Defendant Utilized Tracking Technologies to Monetize Users' Private Information.***

10.     Plaintiff and Class Members who visited and used FCLV's Website (collectively, the "Users") reasonably believed that they were communicating only with their trusted healthcare providers.

11.     At no point has Defendant, despite intentionally incorporating invisible tracking codes from unauthorized third parties into its Website and servers, informed Users that their personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "PII/PHI" or "Private Information") communicated via its Website was intentionally disclosed to a third party—let alone Facebook,[8] which has a sordid history of privacy violations.[9]

12.     However, unbeknownst to Plaintiff and Class Members, Defendant installed tracking technologies on its Website to collect and disclose their Private Information to unauthorized third parties for its own pecuniary gain.

13.     Specifically, Defendant embedded undetectable tracking pixels (the "Pixel(s)" or "Meta Pixel") on the Website, which transmit an incredible amount of

---

[7] *Privacy Policy*, https://fertilitycenterlv.com/privacy/ (last visited Feb. 26, 2024).

[8] Meta Platforms, Inc. is doing business as "Meta" and "Facebook." The terms "Meta" and "Facebook" are used interchangeably throughout.

[9] This Court will not have to look far to find evidence of Meta's violations of privacy laws. Just in May of last year, for instance, the European Union fined Meta "a record-breaking" $1.3 billion for violating EU privacy laws. *See* Hanna Ziady, *Meta slapped with record $1.3 billion EU fine over data privacy*, https://www.cnn.com/2023/05/22/tech/meta-facebook-data-privacy-eu-fine/index.html (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

personal and protected data about its Users to Meta Platforms, Inc., d/b/a Meta ("Meta" or "Facebook"). The collection and transmission of this information is instantaneous, invisible and occurs without any notice to—and certainly no consent from—the Users.[10]

14.    The Meta Pixel, installed and configured by Defendant, is a piece of code that "tracks the people and [the] type of actions they take"[11] as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box).

15.    The pixels—which are configured by the website owners, here, FCLV—collect and transmit information from Users' browsers to unauthorized third parties, including, but not limited to, Facebook (collectively, "Pixel Information Recipients").[12]

16.    Together with the patients' Private Information, the data sent to Facebook also discloses Users' unique and persistent Facebook ID ("Facebook ID" or "FID") which allows Facebook and other third parties to personally identify those Users and associates their Private Information with their Facebook profile.[13]

---

[10] Healthcare providers that use analytics tools like the Meta Pixel or Google Analytics on their websites may also have those tools embedded on a patient portal login page or even inside a patient portal.

[11] *Retargeting*, https://www.facebook.com/business/goals/retargeting (last visited Feb. 28, 2023).

[12] The pixel itself is a small snippet of code placed on webpages by the website owner. The process of adding the pixel to a webpage is a multi-step process that, as described in detail in *Section E*, must be undertaken by the website owner such as FCLV.

While this Complaint primarily focuses on how Defendant embedded the Meta Pixel on their Websites to collect and disclose Users' Private Information, other secret tracking technologies embedded by Defendant—such as for example Google Analytics tracking codes—also collect such Private Information, and the respective tech companies have the capability to link it to specific user profiles.

[13] The Facebook ID is a unique string of numbers Facebook uses to identify and connect to a User's Facebook profile via, among other methods, a *c_user* cookie. Facebook creates a Facebook ID automatically, whether or not you choose to create a username. Thus,Facebook, which creates and maintains the Facebook ID directly connected to a User's Facebook account, utilizes the Facebook ID to personally identify each User whose Private    Information    is    disclosed    to    it.    *See    Facebook    Cookies    Analysis*,

***Defendant's Disclosure of Private Information Without Consent Violates the Law.***

17.    In recent months, and in stark contrast to Defendant, several medical providers that used the Meta Pixel in a similar way have provided their patients with notices of data breaches caused by the Pixel transmitting their information to third parties.[14]

18.    Simply put (and as detailed herein), covered entities such as Defendant are ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third party without express and informed consent from each patient. Neither Plaintiff nor any other Class Members were provided—much less signed— a written authorization permitting Defendant to disclose their Private Information to Facebook or any other third-party data brokers.

19.    As recognized by both the Federal Trade Commission ("FTC") and the Office for Civil Rights ("OCR") of HHS, healthcare companies' use of tracking technologies to collect and divulge their patients' sensitive and confidential information is an extremely serious data security and privacy issue:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to***

---

https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a; *see also* https://www.cyberseo.net/blog/how-to-get-facebook-c_user-and-xs/ (last visited Feb. 26, 2024).

[14] *See, e.g., Cerebral, Inc. Notice of HIPAA Privacy Breach,* https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf (last visited Feb. 28, 2024); *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022), https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3 (last visited Feb. 28, 2024); *Novant Health Notifies 1.3M Patients of Unauthorized PHI Disclosure Caused By Meta Pixel* (Aug. 17, 2022), https://healthitsecurity.com/news/novant-health-notifies-patients-of-unauthorizd-phi-disclosure-caused-by-meta-pixel (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

***marketing firms via tracking pixels on websites or software development kits on apps, watch out.***[15]

20.     Similarly, the OCR is clear that "[r]egulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the Health Insurance Portability and Accountability Act ("HIPAA") Rules."[16]

21.     The HIPAA privacy rule sets forth policies to protect all individually identifiable health information that is held or transmitted, and there are approximately 18 HIPAA Identifiers that are considered PII. This information can be used to identify, contact or locate a single person or can be used with other sources to identify a single individual.

22.     These HIPAA Identifiers, as relevant here, include names, dates related to an individual, device identifiers, web URLs, and IP addresses.[17]

**Defendant Derives Significant Value from Users' Private Information**

23.     There is no anonymity in the information disclosed to Facebook; that is, the Pixel collects and discloses a substantial "data packet" coupled with the FID so that Defendant can, among other things, send targeted advertisements to Users based on their sensitive and protected Private Information. Defendant also uses this impermissibly obtained data for analytics purposes to gain additional insights into how its patients use its Website.[18]

---

[15] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited Feb. 28, 2024).

[16] The OCR Bulletin, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added) (last visited Feb. 28, 2024).

[17] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule,*https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Feb. 28, 2024).

[18] FCLV unquestionably is required to inform its Users if it deploys tracking technologies on its Website so that Users can make informed decisions as to whether they want their

**CLASS ACTION COMPLAINT**

24.     Operating as designed and as implemented by Defendant, the Pixel disclosed information that allows a third party (*e.g.*, Facebook) to know when and where a specific patient was seeking confidential medical care, the medical condition(s) that patients inquired about, and the precise care the patient sought or received. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who target Plaintiff's and Class Members' Facebook accounts based on that Private Information.

25.     While the information captured and disclosed may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, the user's first name, last name, email address and phone number entered on the website. The data packets can also include the buttons a user clicks and the exact words a user types into a search bar.

26.     The data in the "data packets" is then linked to a specific internet protocol ("IP") address, which is itself protected information under HIPAA, as well as the Users' Facebook ID.

27.     For instance, when a User uses Defendant's Website where tracking technologies, such as the Meta Pixel are present, the Pixel transmits the contents of their communications to Facebook, including, but not limited to: (i) medical reproductive and fertility services and treatments sought; (ii) patient status; (iii) searches for specific doctors; (iv) accessing and viewing the bill page and/or the patient portal; (v) sensitive medical diagnoses including known genetic diseases; (vi) sexual identity;; (vii) gender identity; (viii) sexual orientation; (ix) if the person seeking treatment is a minor; (x) if the person seeking treatment was HIV positive; (xi) the text of URLs visited by the User; (xii) marital status; and (xiii) other information that qualifies as PII and PHI under federal and state laws.

---

information to be collected, disclosed, and used in this manner. The OCR Bulletin is, again, instructive: "disclosures of PHI to tracking technology vendors for marketing purposes, ***without individuals' HIPAA-compliant authorizations,*** would constitute impermissible disclosures." *See* OCR Bulletin, *supra* note 16.

**CLASS ACTION COMPLAINT**

28.     By installing the Meta Pixel and other tracking technologies, Defendant effectively planted a bug on Plaintiff's and Class Members' web browsers and caused them to unknowingly disclose their private, sensitive and confidential health-related communications to Facebook (and other third-party data brokers).

29.     The information intercepted by the Pixels and third-party tracking technologies is used to build incredibly fulsome and robust marketing profiles for individual Users and create targeted advertisements based on the medical conditions and other Private Information. Despite the clear and unequivocal prohibition on the disclosure of PHI without consent, FCLV chose to use the Pixel data for marketing purposes to bolster its revenue.

30.     Simply put, Defendant put its desire for revenue over their patients' privacy rights.

***Defendant's Conduct Caused Concrete & Demonstrable Harm to Users.***

31.     As a healthcare provider, Defendant has certain duties and obligations to its patients. Defendant breached those duties and obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure its Website were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web Users' information; (iii) failing to obtain the consent of Plaintiff and Class Members to disclose their PII and PHI to Facebook or other third parties; (iv) failing to take steps to block the transmission of Plaintiff's and Class Members' PII and PHI through the Pixels; (v) failing to warn Plaintiff and Class Members about the tracking technology present on the Website; and (vi) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient PII and PHI.

32.     Plaintiff and Class Members have suffered injury because of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) compromise and disclosure of Private Information; (iv) diminution of value of their

**CLASS ACTION COMPLAINT**

Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.[19]

33.    Plaintiff seeks to remedy these harms for herself and a class of all others similarly situated for: (i) Violation of Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq.* (the "ECPA"), Unauthorized Interception, Use and Disclosure; (ii) Common Law Invasion of Privacy – Intrusion Upon Seclusion; (iii) Breach of Duty of Good Faith and Fair Dealing; (iv) Breach of Implied Contract; (v) Unjust Enrichment; and (vi) Negligence.

**PARTIES**

34.    Plaintiff Sarita Lundin is a natural person and resident of the city of Las Vegas in Clark County, Nevada.

35.    As detailed herein, Plaintiff Lundin accessed Defendant's Website on her computer and mobile devices and used the Website to look for providers of ████ and ████ treatments, review ████ treatments' costs, and track and communicate test and lab results. Plaintiff Lundin has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant time period in this case.

36.    Defendant FCLV is a limited liability company organized under the laws of Nevada with its principal place of business and corporate headquarters at 5365 S Durango Drive, Suite 100, Las Vegas, in Clark County in the state of Nevada.

37.    Defendant is a covered entity under HIPAA.

**JURISDICTION & VENUE**

38.    This Court has "federal question" jurisdiction given the federal claims alleged by Plaintiff, specifically the ECPA, 18 U.S.C. § 2511. This Court also has

---

[19] The exposed Private Information of Plaintiff and Class Members can be—and likely has been—further disseminated to additional third parties utilizing the data for retargeting or insurance companies utilizing the information to set insurance rates. Furthermore, third parties often offer the unencrypted, unredacted Private Information for sale to criminals on the dark web for use in fraud and cyber-crimes.

**CLASS ACTION COMPLAINT**

supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

39.    This Court also has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

40.    The Court has personal jurisdiction over Defendant FCLV because its principal place of business and headquarters are located in Las Vegas, Clark County, Nevada, it regularly engages in business in the State of Nevada and in Clark County and a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this county.

41.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class Members' Private Information; Defendant's principal place of business is located in this District; Defendant collects and redistributes Class Members' Private Information in this District and Defendant caused harm to Class Members residing in this District.

## COMMON FACTUAL ALLEGATIONS

***A.    Federal Regulators Make Clear that the Use of Tracking Technologies to Collect & Divulge Private Information Without Informed Consent is Illegal.***

42.    Defendant's surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the FTC and the OCR of HHS

have—in recent months—reiterated the importance of and necessity for data security and privacy concerning health information.

43.     For instance, the FTC recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Prenom, BetterHelp, GoodRx, and Flo Health* **make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."**[20]

44.     The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[21]

45.     The federal government is taking these violations of health data privacy and security seriously, evidenced by recent high-profile FTC settlements against several telehealth companies.

46.     For example, the FTC recently imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising

---

[20] *See* Elisa Jillison, *supra*, note 15, (emphasis added).
[21] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization).

companies and platforms, including Facebook, Google and Criteo. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google, and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app, Premon, shared health data for advertising purposes.[22]

47.     Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health

---

[22] *See* How FTC Enforcement Actions Will Impact Telehealth Data Privacy, https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy (last visited Feb. 28, 2024); *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 28, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising;https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited Feb. 28, 2024); https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google (last visited Feb. 28, 2024).

---

**CLASS ACTION COMPLAINT**

conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[23]

48.     The OCR at HHS has made clear, in a recent bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[24]

49.     The OCR Bulletin *reminds* healthcare organizations regulated under HIPAA that they may use third-party tracking tools, such as Google Analytics or Pixels *only in a limited way* to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[25]

50.     The OCR Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or***

---

[23] *See* OCR Bulletin, *supra* note 16.
[24] *Id*.
[25] *See id*.

*required by the HIPAA Privacy Rule.*[26]

51.    Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on the digital properties of hospitals, health care providers and telehealth companies to monetize their users' Private Information.

52.    For instance, THE MARKUP reported that 33 of the largest 100 hospital systems in the country utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[27]

53.    And, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[28]

54.    Many healthcare sites had at least one tracker—from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn, and/or Pinterest—that collected patients' answers to medical intake questions.[29]

---

[26] *Id.* (emphasis added).

[27] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP, https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Feb. 28, 2024).

[28] Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools* (Dec. 13, 2022), https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Feb. 28, 2024).

[29] *See id.* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

**CLASS ACTION COMPLAINT**

**_B.    Tracking Pixels._**

55.    Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting, for example, serving online advertisements to people who have previously engaged with a business's website—and other marketing.

56.    Here, a User's web browser executes the Pixels via instructions within each webpage of FCLV's Website to communicate certain information (within parameters set by Defendant) directly to the corresponding Pixel Information Recipients, including Facebook—at the same time as the User's browser is sending this information to Defendant.

57.    The Pixels can also share the Users' identifying information for easy tracking via "cookies"[30] stored on their computer by any of the Pixel Information Recipients with whom they have an account.

58.    For example, Facebook stores or updates a Facebook-specific cookie every time a person accesses their Facebook account from the same web browser.

59.    The Meta Pixel can access this cookie and send certain identifying information like the User's Facebook ID to Facebook along with the other data relating to the User's Website inputs.

60.    The same is true for the other Pixel Information Recipients, which also create cookies that are stored in the User's computer and accessed by the Pixels to identify the User.

61.    The Pixels and other tracking codes are programmable, meaning that Defendant controls which of the webpages on the Website contain the Pixels and which events are tracked and transmitted to the Pixel Information Recipients.

---

[30] "Cookies are small files of information that a web server generates and sends to a web browser Cookies help inform websites about the user, enabling the websites to personalize the user experience." _See_ https://www.cloudflare.com/learning/privacy/what-are- cookies/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

62.     Once put on the Website *by* FCLV and configured *by* FCLV, in at least 2020, the Pixel operated as a wiretap, silently monitoring User activity on those webpages and intercepting the Private Information that Users sent via the Website to FCLV and transmitting that Private Information directly to third parties (like Facebook) without the required informed consent.

63.     Defendant used the data that it collected from Plaintiff and Class Members, without their consent, to improve their advertising and bolster their revenue.

**C.     *Conversions API.***

64.     In addition to the Meta Pixel, Facebook Conversions API and similar tracking technologies allow businesses to send web events, such as clicks, form submissions, keystroke events and other actions performed by the user on the Website, from their own servers to Facebook and other third parties.[31]

65.     Conversions API creates a direct and reliable connection between marketing data (such as website events and offline conversations) from Defendant's servers to Facebook.[32]

66.     In doing so, Defendant stores Plaintiff's and Class Members' Private Information on its own servers and then transmits it to unauthorized third parties like Facebook.

67.     Conversions API is an alternative method of tracking versus the Meta Pixel because no privacy protections on the user's end can defeat it. This is because it is "server-side" implementation of tracking technology, whereas pixels are "client-side"—executed on users' computers in their web browsers.

---

[31] *See* https://revealbot.com/blog/facebook-conversions-api/ (last visited Feb. 28, 2024).
[32] *See* https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

68.    Because Conversions API is server-side, it cannot access the Facebook c_user cookie to retrieve the Facebook ID.[33] Therefore, other roundabout methods of linking the user to their Facebook account are employed.[34]

69.    For example, Facebook has an entire page within its developers' website about how to de-duplicate data received when both the Meta Pixel and Conversions API are executed.[35]

70.    Conversions API tracks the user's website interactions, including Private Information being shared, and then transmits this data to Facebook and other third parties. Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[36]

71.    Defendant installed the Meta Pixel and, upon information and good faith belief, Conversions API, as well as other tracking technologies, on many (if not all) of the webpages within its Website (including webpages for patients to pay their bills or for prospective patients seeking appointments) and programmed or permitted those webpages to surreptitiously share patients' private and protected communications with Facebook (and

---

[33] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses and phone numbers, that we use for matching purposes only." *See* https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/customer-information-parameters/ (last visited Feb. 28, 2024).

[34] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/#req-rec-params (last visited Feb. 28, 2024).

[35] *See* https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel- and-server-events (last visited Feb. 28, 2024).

[36] *About Conversions API*, https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last visited Feb. 28, 2024).

with other Pixel information recipients such as Google via their proprietary tracking codes)—communications that included Plaintiff's and Class Members' Private Information.

**D.    *Defendant's Method of Transmitting Plaintiff's & Class Members' Private Information via Pixels.***

72.    Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client device" (computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome, Mozilla's Firefox, Apple's Safari, and/or Microsoft's Edge browsers).

73.    Every website is hosted by a computer "server" that holds the website's contents. The entity(ies) in charge of the website exchange communications with users' devices as their web browsers query the server through the internet.

74.    Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses, and any given browsing session may consist of thousands of individual HTTP requests and HTTP responses, along with corresponding cookies:

1.    **HTTP request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL. (For instance, uploading a PDF to file a motion to a court.)

2.    **Cookies**: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Cookies are sent with HTTP requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

3.    **HTTP response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

75.     A patient's HTTP request essentially asks Defendant's Website to retrieve certain information (such as a set of health screening questions). The HTTP response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons and other features that appear on the participants' screens as they navigate Defendant's Website.

76.     Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code.

77.     Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

78.     The Pixels are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding Pixel Information Recipient, much like a traditional wiretap.

79.     For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Pixels).

80.     Thus, Defendant is, in essence, handing its patients a tapped website and, once a webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Pixels, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Facebook or another corresponding Pixel Information Recipient

81.     Third parties like Facebook place cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each

1    intercepted communication to ensure the third party can identify the specific user associated

2    with the information intercepted (in this case, highly sensitive Private Information).

3         82.    For example, Facebook uses cookies named c_user, datr, fr and fbp to

4    identify Users. Facebook stores or updates Facebook-specific cookies every time a person

5    accesses their Facebook account from the same web browser.

6         83.    The Meta Pixel can access these cookies and send certain identifying

7    information like the user's Facebook ID to Facebook along with the other data relating to

8    the user's website inputs.

9         84.    The c_user cookie value is the Facebook equivalent of a user identification

10   number. Each Facebook user account has one – and only one – unique c_user cookie.

11   Facebook uses the c_user cookie to record user activities and communications.

12        85.    A User's Facebook ID is linked to their Facebook profile, which generally

13   contains a wide range of demographic and other information about the User, including

14   pictures, personal interests, work history, relationship status, and other details. Because the

15   User's Facebook Profile ID uniquely identifies an individual's Facebook account,

16   Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and

17   easily locate, access, and view the User's corresponding Facebook profile. To find the

18   Facebook account associated with a c_user cookie, one simply needs to type

19   www.facebook.com/ followed by the c_user ID.

20        86.    The Facebook datr cookie identifies the User's web browser. It is an

21   identifier unique to each person's specific web browser, and is another way Facebook can

22   identify Facebook users.

23        87.    The Facebook fr cookie is a combination of the Facebook ID (c_user) and

24   the browser ID (datr) cookie values.

25        88.    A User who accessed Defendant's Website while logged into (or recently

26   having logged into) Facebook would have their browser transmit the c_user, datr and fr

27   cookies to Facebook.

28

**CLASS ACTION COMPLAINT**

89.    At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

90.    Defendant sent these identifiers with the Users' "event" data.

91.    Defendant intentionally configured Pixels installed on its Website to capture both the "characteristics" of individual patients' communications with its Website (their IP addresses, Facebook ID, cookie identifiers, device identifiers, emails and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to their fertility-related health conditions and services sought from Defendant).

92.    This disclosed PHI and PII allows Facebook to know that a specific patient is seeking confidential medical care and the type of medical care being sought, and in addition to permitting Defendant to target those persons with Defendant's ads, Facebook also then sells that information to marketers who will online target Plaintiffs and Class Members.

93.    Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook:

  a.  Plaintiff's and Class Members' status as medical patients;

  b.  Plaintiff's and Class Members' communications with Defendant through its Website, including medical conditions for which they sought treatments and treatments sought;

  c.  Plaintiff's and Class Members' searches for doctors and contacting Defendant; and

  d.  PII, including but not limited to patients' locations, IP addresses, device identifiers, individual's unique Facebook ID and other unique personal identifiers.

94.    Through the Website, Defendant shares its patients' identities and online activity, including information and search results related to their private medical treatment.

95.    For example, when they visit the Website, FCLV patients can search fertility treatments by selecting the "Fertility Treatments" menu which takes them to a list of

**CLASS ACTION COMPLAINT**

services offered by FCLV. Patients are then directed to a variety of sensitive fertility treatments, including, for example "in-vitro-fertilization."

96.    The User's selections and filters are transmitted to Facebook via the Meta Pixels, even if they contain the User's treatment, procedures, medical conditions, or related queries, without alerting the User, and the images below confirm that the communications Defendant FCLV sends to Facebook contain the User's Private Information and personal identifiers, including but not limited to their Facebook ID, IP address, fbp, datr and fr cookies, along with the search filters the User selected.

97.    Here, the search parameters set by the patient and the patient's FID number are being shared together, thereby allowing Facebook to make the direct connection between the search parameters and each individual patient's FID. Even without the FID, other identifying information like IP address or device identifier is captured by the Pixel and transmitted to Facebook.

98.    Facebook categorizes this event as a "PageView," which indicates that the patient viewed the webpage.

99.    Every time Defendant sends a patient's Website activity data to Facebook, that patient's personally identifiable information is also disclosed, including their FID. An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone can look up the user's Facebook profile and name.

100.    While Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who knows or has acquired someone's FID. Facebook admits as much on its website. Indeed, ordinary people who come to acquire an FID can connect to the corresponding Facebook profile.

101.    A user who accesses Defendant's Website while logged into Facebook will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID.

102.    For example, a fertility patient who identifies themselves as a patient who is

"trying to conceive" can choose the drop-down list on the Website that lists those options and then can search for various conditions and treatments, including identifying themselves as someone trying to conceive who is a "person [with a] known genetic disease."[37]

*Figures 1-2: Defendant's transmission to Facebook of User's navigating FCLV's webpage for "Person with a Known Genetic Disease" and "Trying to Conceive":*



103. The fourth line of highlighted text, "id: 6167160766943668," refers to

| × | Headers | Payload | Preview | Response | Initiator | Timing | Cookies |
|---|---|---|---|---|---|---|---|

| :authority: | www.facebook.com |
|---|---|
| :method: | GET |
| :path: | /tr/? |
| | id=6167160769436688&ev=PageView&dl=https%3A%2F%2Ffertilitycenterlv.com |
| | %2Ftrying-to-conceive%2Fperson-known-genetic- |
| | disease%2F&rl=https%3A%2F%2Ffertilitycenterlv.com%2Ffertility- |
| | treatments%2Fadolescent-fertility- |
| | preservation%2F&if=false&ts=1705613479812&sw=1600&sh=1067&v=next&r= |
| | stable&a=wordpress-6.4.2-3.0.14&ec=0&o=4126&eid=ob3_plugin- |
| | set_bee33236d6fc6e5be13bcde56539a98fd0c99f1a4c325dac3a6e2901644bc13d |
| | &fbp=fb.1.1701669820245.1348459562&cs_est=true&ler=other&it=1705613479 |
| | 199&coo=false&cdl=&rqm=GET |
| :scheme: | https |
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | sb=6Zc2ZdIiKNMQ-s7vCP03lvO7; datr=65c2ZU8pUo0fktnKWDa8avSf; |
| | c_user=61552747017033; xs=37%3AWy_Pbx7xbS-E0g%3A2%3A1698083184%3A- |
| | 1%3A-1%3A%3AAcVym55V0iyc5w3Ty0hyKLakHpCtyAbvHilcfnZsrts; dpr=1.5; |
| | fr=1CogS7B879UK3lvGv.AWVnlPRl5aXfLEybYsf1__Gi3zE.BlpY0J.P3.AAA.0.0.BlqEDk. |

---

[37] *See* https://fertilitycenterlv.com/trying-to-conceive/person-known-genetic-disease/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

Defendant's Pixel ID for the Website and confirms that Defendant has downloaded the Pixel into its Source Code on this particular web page.

104.    In that same line of text, "ev:" is an abbreviation for event, and "PageView" is the type of event. Here, this event means that Defendant's Pixel is sending information about the webpage being viewed, which can include information like page title, URL and page description.

105.    The remaining lines of text identify the User as a patient: (i) seeking medical care from Defendant FCLV via www.fertilitycenterlv.com who is (ii) "trying to conceive," and who is (iii) a person with a known genetic disease.

106.    Finally, the second line of highlighted text ("GET"), demonstrates that Defendant's Pixel sent the User's communications, and the Private Information contained therein, alongside the User's personal identifiers, including Facebook ID and other cookies.

107.    As Users move further into FCLV's Website, Defendant continues to disclose User details through PageView events.

108.    Defendant disclosed Users': (i) searches for specific doctors; (ii) fertility-related medical conditions; (iii) fertility treatments sought; (iv) bill payment activities; (v) sexual identity, orientation and./or gender identity; (vi) sensitive medical diagnoses; (vii) marital status; and (viii) patient status.

**CLASS ACTION COMPLAINT**

109.    For example, Defendant shares details about Users' bill payment activities. When a User navigates to the Credit Card Authorization page, Defendant sends PageView events revealing that the User had clicked on "patient services" and was on the page for "online forms" for patients to make a "payment," *see* **Figure 3**:[38]



110.    When a User searches for a doctor, Defendant also sends that information to Facebook through PageView events, including the specific doctor the patient is searching for, *see* **Figure 4**:[39]



---

[38] *See* https://fertilitycenterlv.com/patient-services/online-forms/payment/ (last visited Feb. 28, 2024).

[39] *See* https://fertilitycenterlv.com/about-us/dr-bruce-shapiro/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

111.    Defendant also discloses when Users try to contact them to arrange for a consultation as well as when a patient submits the form requesting the consultation, ***see* Figure 5**:[40]



112.    In fact, Defendant discloses every detail of a User's search for medical fertility conditions and treatments, including male and female infertility, in vitro fertilization, intrauterine insemination, surrogacy, egg and sperm donation, third party parenting, and embryo donation.[41]

113.    In addition to Users' searches for doctors, searches for fertility conditions and treatments, scheduling of appointments and reviewing of financial information, Defendant also discloses sensitive information about the gender identity, sexual orientation of the User and reveals when the User seeking fertility treatment is a minor or HIV positive.

114.    For example, when a User navigates to view FCLV's "Trying to Conceive" tab, the user can select "Same Sex Male Couple."  When the User clicks on that option, FCLV sends PageView event to Facebook revealing that the user was on the page "trying-

---

[40] *See* https://fertilitycenterlv.com/thank-you-page-consult (last visited Feb. 28, 2024).
[41] *See generally* https://fertilitycenterlv.com/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

to-conceive/same-sex-male-couple." *See* **Figure 6**:[42]



115.    Defendant also informs Facebook when Users are seeking Transgender fertility treatments." *See* **Figure 7**:[43]



---

[42]  *See* https://fertilitycenterlv.com/trying-to-conceive/same-sex-male-couple/ (last visited Feb. 28, 2024).
[43]  *See* https://fertilitycenterlv.com/patient-services/lgbt-patients/transgender-fertility/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

116.    In addition, if a User is seeking fertility treatment for Adolescents, Defendant discloses that to Facebook as well: *see* **Figure 8**:[44]



117.    Defendant FCLV even discloses to Facebook that a User was searching for fertility treatment for HIV positive men: *see* **Figure 9**:[45]

[44]   *See*   https://fertilitycenterlv.com/fertility-treatments/adolescent-fertility-preservation/ (last visited Feb. 28, 2024).
[45] *See* https://fertilitycenterlv.com/fertility-treatments/fertility-treatment-for-hiv-men/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

118.    Defendant did not seek and did not have Plaintiff's and Class Members' consent to share any of the sensitive Private Information described above.

**E.    Facebook Uses Certain "Business Tools" to Match the Information it Collects to Facebook Users.**

119.    Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021.[46] Roughly 97% of that came from selling advertising space.[47]

120.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilize its "Business Tools" to gather, identify, target, and market products and services to individuals.

121.    Facebook's Business Tools, including the Meta Pixel, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

122.    In particular, the Meta Pixel "tracks the people and type of actions they take."[48]

123.    The user's web browser (software applications that allow consumers to exchange electronic communications over the Internet) executes the Pixel via instructions within the webpage to communicate certain information based on parameters selected by the website's owner.

124.    The Pixel is thus customizable and programmable, meaning that the website owner controls which of its web pages contain the Pixel and which events are tracked and transmitted to Facebook.

---

[46] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Feb. 28, 2024).
[47] *Id.*
[48] *Retargeting*, *supra* note 11.

**CLASS ACTION COMPLAINT**

125.    The process of adding the Pixel to webpages is a multi-step process that must be undertaken *by the website owner*.[49]

126.    Facebook guides the website owner through setting up the Pixel during the setup process. Specifically, Facebook explains that there are two steps to set up a pixel:

> 1. Create your pixel and set up the pixel base code on your website. You can use a partner integration if one is available to you or you can manually add code to your website.
>
> 2. Set up events on your website to measure the actions you care about, like making a purchase. You can use a partner integration, the point-and-click event setup tool, or you can manually add code to your website.[50]

127.    Aside from the various steps to embed and activate the Pixel, website owners, like Defendant, must also agree to Facebook's Business Tools Terms by which Facebook requires website owners using the Meta Pixel to "represent and warrant" that they have adequately and prominently notified users about the collection, sharing and usage of data through Facebook's Business Tools (including the Pixel and Conversions API)[51] and that websites "will not share Business Tool Data . . . that [websites] know or reasonably should know . . . includes health, financial information or other categories of sensitive information . . . ."[52]

---

[49] *Business Help Center: How to set up and install a Meta Pixel*, https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 28, 2024); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited Feb. 28, 2024).
[50] *Id*.
[51] *Meta Business Tools Terms*, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfbOvnb7E0sZ-wzgCW6xNLFKEOEVH_fr6JjkMINTJNqN7i1R-3MPh5caFgmdgAOxbL8&_rdr (last visited Feb. 28, 2024) ("When you use any of the Meta Business Tools to send us or otherwise enable the collection of Business Tool Data . . ., these Business Tools Terms govern the use of that data").
[52] *Id.*; *see also* Pratyush Deep Kotoky, *Facebook collects personal data on abortion seekers: Report* (June 16, 2022) https://www.newsbytesapp.com/news/science/facebook-collects-personal-data-on-abortion-seekers/story (quoting Facebook spokesman Dale Hogan as saying that it is "against [Facebook's] policies for websites and apps to send sensitive health data about people through [its] Business Tools") (last visited Feb. 28, 2024).

128.    Once fully loaded and operational, the Pixel prompts the Users' web browser to transmit specific information based on parameters set by the website owner. This customizable nature of the Meta Pixel allows the website owner to determine which webpages contain the Pixel, which events are tracked and shared with Facebook and whether the tracked events are standard (chosen from the list of 18 provided by Facebook) or custom (defined by the website owner). For example, the Pixel can be set to capture the URLs visited by website visitors via a "PageView" event, or to capture the exact inner text of buttons clicked by a visitor, via a "SubscribedButtonClick" event.

129.    The Business Tools are automatically configured to capture "Standard Events," such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[53]

130.    Advertisers, such as Defendant, can track other User actions and can create their own tracking parameters by building a "custom event."[54]

131.    When a user accesses a webpage that is hosting the Meta Pixel, their communications and interactions with the host webpage are instantaneously and surreptitiously sent to Facebook's servers—traveling from the user's browser to Facebook's server.[55]

132.    This simultaneous secret transmission contains the original GET request sent to the host website, along with additional data that the Meta Pixel is configured to collect.

---

[53] *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 28, 2024); *see also* META PIXEL, GUIDES, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Feb. 28, 2024); BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last visited Feb. 28, 2024); APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Feb. 28, 2024).

[54] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last visited Feb. 28, 2024).

[55] Plaintiff unequivocally and in good faith plead that Defendant's Pixel transmissions to Facebook occur simultaneously as Users navigate and use Defendant's Websites.

This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

133.    In particular, Defendant tracked Users and disclosed Users' Private Information including at least the following:

- What care and treatment options Users viewed and/or sought;
- When Users clicked to request an appointment;
- Users' unique personal identifiers when they requested an appointment including their FID and IP address;
- When Users accessed the Patient Portal webpage; and
- When Users clicked to access and view the bill page.

134.    Accordingly, during the same transmissions, the Website routinely provide Facebook with Defendant's patients' Facebook IDs, IP addresses and/or device IDs, and the other information they input into Defendant's Website, including their medical searches, treatment requests, and the webpages they view.

135.    This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[56] Plaintiff's and Class Members' identities can be easily determined based on the Facebook ID, IP address, and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

136.    Instead of taking proactive steps to verify that businesses using the Pixel obtain the required consent, Meta uses an "honor system" under which Meta assumes these businesses have "provided robust and sufficient prominent notice to users regarding the Business Tool Data collection, sharing, and usage."[57]

---

[56] See          https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Feb. 28, 2024).

[57] See Facebook Business Tools Terms, https://www.facebook.com/legal/terms/businesstools.

137.    After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

138.    When the Website visitor is also a Facebook user, the information collected via the Meta Pixel is associated with the User's Facebook ID that identifies their name and Facebook profile—their real-world identity.

139.    The Pixel collects data regardless of whether the visitor has an account. Facebook maintains "shadow profiles" on Users without Facebook accounts and links the information collected via the Meta Pixel to the User's real-world identity using their shadow profile.[58]

140.    A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

141.    Because Defendant includes the c_user cookie in the data sent to Facebook, tools such as VPNs are insufficient to hide a User's identity. VPNs anonymize users' IP addresses, however, since the c_user cookie specifically identifies the User's Facebook profile, Facebook knows exactly who the User is regardless of the User's IP address.

142.    The Private Information disclosed via the Pixel allows Facebook to know that a specific patient is seeking confidential medical care and the type of medical care being sought. Facebook then uses that information to sell advertising to Defendant and other

---

[58] *See* Russell Brandom, *Shadow Profiles Are the Biggest Flaw In Facebook's Privacy Defense*, (Apr 11, 2018), https://www.theverge.com/2018/4/11/17225482/facebook-shadow-profiles-zuckerberg-congress-data-privacy (last visited Feb. 28, 2024).

1  advertisers and/or sells that information to marketers who use it to online target Plaintiff
2  and Class Members.

3       143.    Facebook (and other Pixel Information Recipients) track user data and
4  communications for their own marketing purposes and for the marketing purposes of the
5  website owner. Ultimately, the purpose of collecting user data is to make money.

6       144.    Thus, without any knowledge, authorization or action by a user, website
7  owners like Defendant use source code to commandeer the user's computing device,
8  causing the device to contemporaneously and invisibly re-direct the users' communications
9  to third parties.

10      145.    In this case, Defendant employed the Pixels, among other tracking
11 technologies, to intercept Plaintiff's and Class Members' Private Information to Facebook
12 and the other Pixel Information Recipients.

13      146.    In sum, the Pixels and other tracking technologies on the Website permitted
14 Facebook and any other Pixel Information Recipient to intercept the content of Plaintiff's
15 and Class Members' highly sensitive communications and Private Information , which
16 communications contained private and confidential medical information.

17      147.    These interceptions of Plaintiff's and Class Members' communications
18 content were performed without Plaintiff's or Class Members' knowledge, consent, or
19 express written authorization.

20   **F. Plaintiff and Class Members Did Not Provide Authorization to Defendant or
        Facebook to Disclose Their PHI To Facebook**
21
22      148.    When an individual creates a Facebook account, they enter into an agreement
22 with Facebook by accepting and acknowledging the Terms of Service, Data Policy/Privacy
23 Policy and Cookie Policy. This agreement is confirmed through a checkbox on the sign-up
24
25
26
27
28

**CLASS ACTION COMPLAINT**

page. Both Facebook and its users are obligated to abide by these binding Terms of Service and Policies.

149.    Although the Facebook Data Policy makes general broad disclosures about the data it collects, the scope of Facebook's "data license" is not unlimited.  For example, by signing up for Meta, a Facebook user has not agreed to exchange with Facebook the right for Facebook to obtain their bank account information or Social Security number.

150.    The Facebook Privacy Policy does not state that Facebook actively solicits Facebook users' healthcare providers, health insurers, pharmacies, prescription drug companies, and other covered entities under 45 C.F.R. § 160.103 to become Facebook Partners using Facebook's business services.

151.    The Facebook Privacy Policy does not state that, in exchange for use of its Products, Facebook will collect health information from a Facebook user's healthcare providers, health insurers, pharmacies, prescription drug companies, or other covered entities under 45 C.F.R § 160.103 about the Facebook user, including their communications, actions, and status as patients with those health entities.

152.    Facebook Data Policy explicitly states that businesses utilizing the Pixel are obligated to possess legal rights to collect, use, and share user data before sharing any data with Facebook.[59]

153.    However, Facebook does not verify whether the businesses utilizing the Pixel have indeed obtained the necessary consent. Instead, Facebook relies on its business customers to police themselves. Businesses need only "represent and warrant" that they have adequately and prominently notified users about the collection, sharing, and usage of data through their Business Tools.[60]

---

[59] *Meta Business Help Center: About restricted Meta Business Tools Data*, https://www.facebook.com/business/help/1057016521436966?id=188852726110565 (last visited on Feb. 28, 2024).

[60] Before April 2018, Meta's contract did not require its business "partners" to have the lawful right to share user data before doing so.

**CLASS ACTION COMPLAINT**

154.    Facebook's contract with healthcare providers for use of the Meta Pixel does not mention HIPAA.

155.    Defendant does not have legal authority to use or share Plaintiff's and Class Members' Private Information with Facebook as this information is protected under HIPAA and other federal and state laws.

156.    In essence, when Facebook contracts with a healthcare provider like Defendant, both entities fail to ensure compliance with their own Terms of Service and/or privacy policies, as well as state and federal laws protecting sensitive health information.

**G.    FCLV's Use of the Pixels Violated Its Own Privacy Policies.**

157.    Defendant's privacy policy represents to patients and visitors to its Website that it will keep their Personal Information, including their PHI, private and secure and that it will only disclose PHI provided to them under certain circumstances, ***none of which apply here***.[61]

158.    With respect to tracking technologies and analytics, although Defendant admits to using these tools to collect information about browsing activity, it does not disclose to Users that it discloses their PHI and PII to third parties, including Facebook.

159.    For example, Defendant FCLV's Policy admits that it collects information about its Users but that "[w]e do not share this information with outside parties."[62]

160.    Defendant FCLV also acknowledges that it collects IP addresses, cookies, and similar technologies but it claims that "ad network partner uses cookies and Web beacons to collect ***non-personally identifiable information*** about your activities on this and other Web sites" and announces that "it is important to note that ***these cookies do not provide us with any identifiable information***.".[63]

---

[61] *See* https://fertilitycenterlv.com/privacy/ (last visited Feb. 25, 2024).
[62] *See Id*. (last visited Feb. 25, 2024).
[63] *Id*.

161.    Defendant FCLV further assures its patients that it "would not disclose anything that could be used to identify those individuals."[64]

162.    Patients and other Users of the Website are not informed about and have not consented to the disclosure of their Personal Information and their Website activity to a third party, including Facebook.

163.    This is precisely the type of information for which HIPAA requires healthcare providers to utilize de-identification techniques to protect the privacy of patients.[65]

164.    Despite a lack of disclosure, Defendant allows Facebook to "listen in" on patients' confidential communications and to intercept and use for advertising purposes the very information that it promises to keep private.

165.    Defendant breached its own privacy policies by unlawfully permitting Facebook and likely other third parties to intercept Users' Private Information without obtaining patients' consent or authorization. Facebook then read, understood, and used that Private Information for its own business purposes—i.e., selling targeted advertising to Defendant (and other companies) which specifically targeted those Users based on their reproductive health conditions.

## H.    *Defendant Violated HIPAA.*

166.    Defendant's disclosure of Plaintiff's and Class Members' Private Information to entities like Facebook also violated HIPAA.

167.    Under federal law, a healthcare provider may not disclose PII, non-public medical information about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[66]

---

[64] *Id.*
[65]    *See*    https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Feb. 2, 2024).
[66] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

**CLASS ACTION COMPLAINT**

168.    Guidance from HHS instructs healthcare providers that patient status alone is protected by HIPAA.

169.    HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

170.    The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

171.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

>    A.  Names;
>    …
>    H.  Medical record numbers;
>    …
>    J.   Account numbers;
>    …
>    M.  Device identifiers and serial numbers;
>    N.  Web Universal Resource Locators (URLs);
>    O.  Internet Protocol (IP) address numbers; … and
>    P.  Any other unique identifying number, characteristic, or
>        code… and" the covered entity must not "have actual

**CLASS ACTION COMPLAINT**

knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[67]

172.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

173.   Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI.

174.   HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[68]

175.   Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[69]

176.   Here, as described *supra*, Defendant provided patient information to third parties in violation of the Privacy Rule—and its own Privacy Policy. An individual or

---

[67] *See* 45 C.F.R. § 160.514.
[68] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, (last visited Feb. 28, 2024).
[69]*Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html  (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."

177.    The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

178.    Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

179.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306I, and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1)—which Defendant failed to do.

180.    Under HIPAA, Defendant may not disclose PII about a patient, potential patient or household member of a patient for marketing purposes without the patient's express written authorization. See HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

181.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a)    Failing to ensure the confidentiality and integrity of

electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b)   Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c)   Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. section 164.308(a)(6)(ii);

d)   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e)   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3); and

f)   Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

182.   In disclosing the content of Plaintiff's and Class Members' communications, Defendant had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions, that is, to illegally disclose Plaintiff's and Class Members' Private Information to Facebook (and other Pixel Information Recipients) in violation of HIPAA, including 42 U.S.C. § 1320d-6(a)(3), as well as the torts alleged below.

183.   Defendant intercepted the content of Plaintiff's and Class Members' communications, including their Private Information, for a criminal and tortious purpose. Defendant would not have been able to obtain the Private Information or the marketing services it did if it had complied with the law.

184.   Commenting on a June 2022 report discussing the use of Meta Pixels by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled

by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."70

185.   Defendant's placing third-party tracking codes on its Website is a violation of Plaintiff's and Class Members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Defendant's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**I.   *Defendant's Use of the Pixel Violates OCR Guidance.***

186.   The federal government has issued guidance warning that tracking technologies like the Pixel may come up against federal privacy law when installed on healthcare websites.

187.   As mentioned previously, healthcare organizations regulated under the HIPAA may use third-party tracking tools, such as Google Analytics or Pixels only in a limited way to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.71

188.   According to the Bulletin, Defendant has violated HIPAA rules by implementing the Pixel and other tracking technologies.72

189.   Defendant has shared Plaintiff's and Class Members' Private Information, including health conditions for which they seek treatment, treatments and/or medications sought, the frequency with whom they take steps to obtain healthcare for certain conditions, and their unique identifiers. This information is, as described in the OCR Bulletin, "highly sensitive."

---

70 ADVISORY BOARD, '*Deeply Troubled'*: *Security experts worry about Facebook trackers on hospital sites*, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (last visited Feb. 28, 2024).

71 *See* OCR Bulletin, *supra* note 16.

72 *See id.* ("disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures").

190.    The OCR Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code.***[73]

191.    Defendant's sharing of Private Information with Facebook and other Pixel Information Recipients violated Plaintiff's and Class Members' rights.

**J.    *Defendant Violated Industry Standards.***

192.    A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship—it is a cardinal rule.

193.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

194.    AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.] [74]

195.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate

---

[73] *Id.* (emphasis added).

[74] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

when the individual lacks decision-making capacity about the purposes for which access would be granted.[75]

196.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping with ethics guidelines for confidentiality.[76]

197.    Defendant's use of the Pixels also violates FTC data security guidelines. The FTC has promulgated numerous guides for businesses, which highlight the importance of implementing reasonable data security practices.

198.    The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[77] established cyber-security guidelines for businesses. These guidelines state that businesses should protect the personal patient information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network vulnerabilities, and implement policies to correct any security problems.

199.    In fact, the FTC has recently brought enforcement actions against several healthcare companies, including Premom, BetterHelp, GoodRx, and Flow Health for conveying information—or enabling an inference—about their consumers' health to unauthorized third parties without the consumers' consent.

200.    Like the health care companies fined by the FTC in recent years, Defendant failed to implement these basic, industry-wide data security practices.

---

[75] *Id.*

[76] *Id.*

[77] *See*  https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

**K.    _Users' Reasonable Expectation of Privacy._**

201.    Plaintiff and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

202.    Indeed, when Plaintiff and Class Members provided their Personal Information to Defendant, they each had a reasonable expectation that the information would remain private, and that Defendant would not share the Private Information with third parties for a commercial purpose unrelated to patient care.

203.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

204.    For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[78]

205.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class Members.

206.    Plaintiff's and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Defendant's status as healthcare providers, Defendant's common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws

---

[78] _Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds_, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Feb. 28, 2024).

1    prohibiting the unauthorized use and disclosure of personal means of identification, and

2    Defendant's express and implied promises of confidentiality.

3    *L.    Unique Personal Identifiers are Protected Health Information.*

4        207.    While not all health data is covered under HIPAA, the law specifically

5    applies to healthcare providers, health insurance providers, and healthcare data

6    clearinghouses.[79]

7        208.    The HIPAA privacy rule sets forth policies to protect all individually

8    identifiable health information that is held or transmitted, and there are approximately 18

9    HIPAA Identifiers that are considered PII. This information can be used to identify, contact,

10   or locate a single person or can be used with other sources to identify a single individual.

11       209.    These HIPAA Identifiers, as relevant here, include names, dates related to

12   an individual, email addresses, device identifiers, web URLs and IP addresses.[80]

13       210.    Defendant improperly disclosed Plaintiff's and Class Members' HIPAA

14   identifiers, including their computer IP addresses, device identifiers, and web URLs visited

15   to Facebook through their use of the Pixel *in addition to* services selected, patient statuses,

16   medical conditions, treatments, provider information, and appointment information.

17       211.    An IP address is a number that identifies the address of a device connected

18   to the Internet. IP addresses are used to identify and route communications on the Internet.

19

20

_____

21   [79] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving

22   Kids' Information to Facebook* (June 21, 2022), https://themarkup.org/pixel-
     hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-

23   facebook (stating that "[w]hen you are going to a covered entity's website, and you're
     entering information related to scheduling an appointment, including your actual name, and

24   potentially other identifying characteristics related to your medical condition, there's a
     strong possibility that HIPAA is going to apply in those situations") (last visited Feb. 28,

25   2024).

26   [80] *Guidance regarding Methods for De-identification of Protected Health Information in
     Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy*

27   *Rule*,            https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-
     identification/index.html (last visited Feb. 28, 2024).

28

IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

212. Facebook tracks every IP address ever associated with a Facebook user (and with non-users through shadow profiles). Google also tracks IP addresses associated with Internet users.

213. Facebook, Google, and other third-party marketing companies track IP addresses to target individual homes and their occupants with advertising.

214. Under HIPAA, an IP address is considered personally identifiable information, which is defined as including "any unique identifying number, characteristic or code," specifically listing IP addresses among examples. See 45 C.F.R. § 164.514 (2).

215. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

216. Consequently, Defendant's disclosure of Plaintiff's and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

**M.    *Defendant was Enriched by & Benefitted from the Use of the Pixel & Other Tracking Technologies.***

217. Defendant decided to embed the Pixel and other tracking technologies on its Website with the purpose of disclosing Plaintiff's and Class Members's communications to Facebook and other Pixel Recipients in order to improve marketing by creating campaigns that maximize conversions and thereby decrease costs to Defendant and boost their revenue.

218. After receiving individually identifiable patient health information communicated on Defendant's Website, Facebook analyzes this data, improves its own technology and business (including machine learning), and then forwards this data and analysis of this data, to Defendant.

219.    Defendant then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Website.

220.    Facebook, as well, uses this data and analysis for its own commercial purposes, including to improve its platform and better understand the individuals that make up the audiences that its clients (advertisers) pay Facebook to target with ads.

221.    Defendant also receives an additional commercial benefit from using Facebook's tracking tools, such as the Meta Pixel, in being able to serve more targeted advertisements to existing and prospective patients on their Meta accounts such as Facebook and Instagram.

222.    Facebook advertises its Pixel as a piece of code "that can help you better understand the ***effectiveness of your advertising*** and the actions people take on your site, like visiting a page or adding an item to their cart. You'll also be able to see when customers took an action after seeing your ad on Facebook and Instagram, which can help you with retargeting."[81]

223.    Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. In particular, retargeting operates through code and tracking pixels placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[82]

224.    The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a health care website back to Facebook via the tracking technologies and the Pixel embedded on, in this case, Defendant's Website.

225.    For example, when a User searches for doctors, medical conditions or treatment on FCLV's Website, that information is sent to Facebook. Facebook can then use

---

[81] *What is the Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel (emphasis added) (last visited Feb. 28, 2024).
[82] *The complex world of healthcare retargeting,* https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

its data on the User to find more users to click on a FCLV ad and ensure that the targeted Users are more likely to convert.[83]

226.    Through this process, the Meta Pixel loads and captures as much data as possible when a User loads a healthcare website that has installed the Pixel. The information the Pixel captures "includes URL names of pages visited, and actions taken—all of which could be potential examples of health information."[84]

227.    Plaintiff's and Class Members' Private Information has considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

228.    In exchange for disclosing the Private Information of their account holders and patients, Defendant is compensated by Facebook (and other Pixel Information Recipients) in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

229.    But companies have started to warn about the potential HIPAA violations associated with using pixels and tracking technologies because many such trackers are not HIPAA-compliant or are only HIPAA-compliant if certain steps are taken.[85]

230.    For example, Freshpaint, a healthcare marketing vendor, cautioned that "Meta isn't HIPAA-compliant. They don't sign BAAs, and the Meta Pixel acts like a giant personal user data vacuum sending PHI to Meta servers," and "[i]f you followed the Facebook (or other general) documentation to set up your ads and conversion tracking using the Meta Pixel, remove the Pixel now."[86]

---

[83] *See, e.g.*, *How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking (last visited Feb. 28, 2024).
[84] *Id.*
[85] *See The guide to HIPAA compliance in analytics,* https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last visited Feb. 28, 2024).
[86] *How To Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking*, *supra* note 90.

231.    Medico Digital also warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[87]

232.    Whether a user has a Facebook profile is not indicative of damages because Facebook creates shadow profiles, and at least one court has recognized that the pixels' ability to track comprehensive browsing history is also relevant. *See, e.g.*, *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1078–79 (N.D. Cal. 2021) (finding a reasonable expectation of privacy where Google combined the unique identifier of the user it collects from websites and Google Cookies that it collects across the internet on the same user).

233.    Upon information and good faith belief, Defendant retargeted patients and potential patients, including Plaintiff and Class Members.

234.    Thus, utilizing the Pixels directly benefits Defendant by, among other things, reducing the cost of advertising and retargeting.

*N.    Plaintiff's Private Information is Extremely Valuable.*

235.    Plaintiff's and Class Members' Private Information has value, and Defendant's disclosure and interception harmed Plaintiff and the Class by not compensating them for the value of their Private Information and, in turn, decreasing the value of their Private Information.

236.    Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

237.    The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

---

[87] *The complex world of healthcare retargeting, supra* note 82.

**CLASS ACTION COMPLAINT**

238.   The robust market for Internet user data has been analogized to the "oil" of the tech industry.[88] A 2015 article from TechCrunch accurately noted that "[d]ata has become a strategic asset that allows companies to acquire or maintain a competitive edge."[89] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

239.   Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs).[90] That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

240.   Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[91]

241.   This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiff herein can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay Internet users for their data.[92]

---

[88]   *See*    https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Feb. 28, 2024).

[89] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Feb. 28, 2024).

[90]   *See What Your Data is Really Worth to Facebook* (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/ (last visited Feb. 28, 2024).

[91] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

[92] *See 10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/ (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

242.    There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

243.    Courts recognize the value of personal information and the harm when it is disclosed without consent.[93]

244.    Healthcare data is particularly valuable on the black market because it often contains all of an individual's PII and medical conditions as opposed to a single piece of information that may be found in a financial breach.

245.    Healthcare data is incredibly valuable because, unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it has been detected, it can take years to undo the damage caused.

246.    The value of health data is well-known and various reports have been conducted to identify its value.

247.    Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[94]

248.    Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to

---

[93] *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding that Plaintiff's allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

[94] *See* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20 Healthcare%20Data.pdf (last visited Feb. 28, 2024).

**CLASS ACTION COMPLAINT**

1  $250 per record on the black market, compared to $5.40 for the next highest value record

2  (a payment card).[95]

3      249.  The value of health data has also been reported extensively in the media. For

4  example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels

5  a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for

6  health data and observed that the market for information was both lucrative and a significant

7  risk to privacy.[96]

8      250.  Similarly, CNBC published an article in 2019 in which it observed that "[d]e-

9  identified patient data has become its own small economy: There's a whole market of

10  brokers who compile the data from providers and other health-care organizations and sell it

11  to buyers."[97]

12      251.  The dramatic difference in the price of healthcare data compared to other

13  forms of private information commonly sold is evidence of the value of PHI.

14      252.  These rates are assumed to be discounted because they do not operate in

15  competitive markets, but rather, in an illegal marketplace. If a criminal can sell other

16  Internet users' stolen data, surely Internet users can sell their own data.

17      253.  In short, there is a quantifiable economic value to Internet users' data that is

18  greater than zero. The exact number will be a matter for experts to determine.

19      254.  Defendant shared Plaintiff's and Class Members' communications and

20  transactions on its Website without permission.

21      255.  The unauthorized access to Plaintiff's and Class Members' personal and

22  Private Information has diminished the value of that information, resulting in harm to

23  Website Users, including Plaintiff and Class Members.

24

25  [95] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited Feb. 28, 2024) (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

26  [96] *See* https://time.com/4588104/medical-data-industry/ (last visited Feb. 28, 2024).

27  [97] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Feb. 28, 2024).

28

256.    Plaintiff has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**REPRESENTATIVE PLAINTIFF'S EXPERIENCES**

257.    Plaintiff Sarita Lundin accessed and used the FCLV Website using her personal phone and tablet while located in Nevada to seek medical treatment for ███ as recently as September October 2021.

258.    Plaintiff Lundin was a patient of FCLV since approximately July 2020. She was treated for ████████████████████████

259.    Plaintiff Lundin began using Defendant's patient portal and Website in May 2020. Plaintiff Lundin's first appointment with FCLV was in July 2020.

260.    Plaintiff Lundin used Defendant's Website to, among other things, search for a doctor, pay for medical services, schedule appointments, use the Patient Portal, and research ████████████████████████████████████████████████████████████████████████████████████████

261.    Information that Plaintiff Ludin provided to Defendant via its Website included queries about her medical conditions as well as for testing, diagnosis and treatments for █████

262.    Plaintiff Lundin had an active Facebook account during the time she was providing her Private Information to Defendant via its Website.

263.    After she provided information to Defendant and ████████████████ ██████████████████████████████████████████ on the Website, Plaintiff Lundin began receiving ads for ██████████ ████████████ on her Meta accounts (Facebook and Instagram).

264.    Plaintiff Lundin reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and

55

**CLASS ACTION COMPLAINT**

that such communications would **not** be transmitted to or intercepted by any third party without her full knowledge and informed consent.

265.    Plaintiff Lundin provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

266.    As described herein, Defendant worked along with Facebook to intercept Plaintiff Lundin's communications, including those that contained confidential Private Information, while Plaintiff Lundin was within the state of Nevada.

267.    Defendant willfully facilitated these interceptions without Plaintiff Lundin's knowledge, consent or express written authorization.

268.    Within the State of Nevada, Defendant transmitted Plaintiff Lundin's FID, computer IP address, location, information such as treatment sought, and appointment type, physician(s) selected and medical history to Facebook.

269.    By doing so without her consent, Defendant breached Plaintiff Lundin's right to privacy and unlawfully disclosed her Private Information.

270.    Defendant did not inform Plaintiff Lundin that it shared her Private Information with Facebook.

271.    Plaintiff Lundin suffered damages in, *inter alia*, the form of (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain; (iv) diminution of value of the Private Information; (v) statutory damages and (vi) the continued and ongoing risk to her Private Information.

272.    Plaintiff Lundin has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure. Plaintiff Lundin wants to continue to communicate through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Facebook, and thus continues to be at risk of harm from Defendant's conduct.

**CLASS ACTION COMPLAINT**

1

**TOLLING**

2

273.    Any applicable statute of limitations has been tolled by the "delayed

3  discovery" rule. Plaintiff did not know (and had no way of knowing) that their Private

4  Information was intercepted and unlawfully disclosed because Defendant kept this

5  information secret. Plaintiff only discovered that their Private Information had been

6  disclosed by Defendant in February 2024.

7

**CLASS ACTION ALLEGATIONS**

8

274.    **Class Definition:** Plaintiff brings this action on behalf of herself and on

9  behalf of various classes of persons similarly situated, as defined below, pursuant to Rule

10  23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

11

275.    The Nationwide Class that Plaintiff seeks to represent is defined as:

12
13
14

> All individuals residing in the United States who used
> Defendant's Website and had Private Information shared with
> unauthorized third parties including, but not limited to,
> Facebook during the applicable statutory period.

15

276.    The Nevada Sub-Class that Plaintiff seeks to represent is defined as:

16
17

> All individuals residing in Nevada who used Defendant's
> Website and had Private Information shared with
> unauthorized third parties including, but not limited to,
> Facebook during the applicable statutory period.

18

19  277.    Plaintiff reserves the right to modify the class definition or add sub-classes

20  as necessary prior to filing a motion for class certification.

21  278.    The "Class Period" is the time period beginning on the date established by

22  the Court's determination of any applicable statute of limitations, after consideration of any

23  tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

24  279.    The Nationwide Class, and the Nevada Sub-Class are referred to collectively

25  as the "Classes."

26  280.    Excluded from the proposed Class are Defendant; any affiliate, parent, or

27  subsidiary of Defendant; any entity in which Defendant has a controlling interest; any

28

**CLASS ACTION COMPLAINT**

officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

281.    Plaintiff reserves the right to amend the definitions of the Class or Sub-class add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded or otherwise modified.

282.    <u>Numerosity/Ascertainability</u>. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and non-party Facebook's records.

283.    <u>Typicality</u>. Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Website and had her personally identifiable information and protected health information disclosed to Facebook without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

284.    <u>Adequacy</u>. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class.

285.    <u>Common Questions of Law and Fact</u>. Questions of law and fact common to the Class predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

a. Whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

b. Whether Defendant had duties not to disclose Plaintiff's and Class Members' Private Information to unauthorized third parties;

c. Whether Defendant violated its privacy policies by disclosing Plaintiff's and Class Members' Private Information to Facebook, Meta, or other third parties;

d. Whether Defendant adequately, promptly and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been disclosed without their consent;

f. Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patient's Private Information;

g. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information;

h. Whether Defendant knowingly made false representations or omitted material representations as to their data security and/or privacy policy practices;

i. Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices;

j. Whether Defendant's acts and practices violated Plaintiff's and Class Members' privacy rights;

k. Whether Plaintiff and Class Members are entitled to actual,

**CLASS ACTION COMPLAINT**

consequential or nominal damages as a result of Defendant's wrongful conduct; and

l.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

286.  <u>Superiority</u>. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## **CLAIMS FOR RELIEF**

## **COUNT I**

### **VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1), *et seq.***
**<u>(On behalf of Plaintiff & the Nationwide Class)</u>**

287.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of herself and the proposed Class.

288.  The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

289.  The ECPA protects both sending and receipt of communications.

290.  18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

291.    The transmissions of Plaintiff's PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

292.    <u>Electronic Communications</u>. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

293.    <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] ***any information concerning the substance, purport, or meaning of that communication***." 18 U.S.C. § 2510(8) (emphasis added).

294.    <u>Interception</u>. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

295.    <u>Electronical, Mechanical, or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

296.    The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    The cookies Defendant and Meta use to track Plaintiff's and the Class Members' communications;

b.    Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' computing devices;

d.    Defendant's web-servers and

e.    The Pixels deployed by Defendant to effectuate sending and acquiring Users' and patients' sensitive communications.

**CLASS ACTION COMPLAINT**

297. Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

298. By utilizing and embedding the Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

299. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Meta Pixel, CAPI and other tracking technologies, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Facebook.

300. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including IP address, Facebook ID, and treatment information.

301. Additionally, through the above-described tracking tools, Defendant transmitted the communications about treatments and conditions, including but not limited to the (i) medical reproductive and fertility services and treatments sought; (ii) patient status; (iii) searching for doctors; (iv) accessing and viewing the bill page; (v) sexual identity; (vi) sensitive medical diagnosis (vii) gender identity; (viii) sexual orientation; (ix) if the person seeking treatment is a minor; (x) if the person seeking treatment was HIV positive; (xi) marital status; (xii) the text of URLs visited by the User and (xiii) other information that qualifies as PII and PHI under federal and state laws.

302. This information was, in turn, used by third parties, such as Facebook, to 1) place Plaintiff in specific health-related categories and 2) target Plaintiff with particular advertising associated with Plaintiff's specific reproductive health conditions. Defendant knowingly transmits this data and does so for the purpose of financial gain.

303. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to third parties, while knowing or having reason to

know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

304.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

305.    Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of Nevada—namely, invasion of privacy, among others.

306.    Any party exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information (IIHI) to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual*, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[98]

---

[98] *Id.* § 1320d-(6) (emphasis added).

307.    Plaintiff's information that Defendant disclosed to third parties qualifies as IIHI, and Defendant violated Plaintiff's expectations of privacy, and constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6).

308.    Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

309.    Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communications.

310.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Pixel. Plaintiff and absent class members (all of whom are patients) had a reasonable expectation that Defendant would not re-direct their communications content to Facebook, Google or others attached to their personal identifiers in the absence of their knowledge or consent.

311.    Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

312.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, researching medical conditions and treatment and scheduling appointments with doctors, Defendant's purpose was tortious, criminal and designed to violate federal and state law including a knowing intrusion into a private place or matter that would be highly offensive to a reasonable person.

313.    Consumers have the right to rely upon the promises that companies make to them. Defendant accomplished their tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that cause Meta Pixels and cookies (including but not limited to the fbp, ga and gid cookies) and other tracking technologies to be deposited on Plaintiff's and Class members' computing devices as "first-party" cookies that are not blocked.

314. Defendant's scheme or artifice to defraud in this action consists of:

    a. the false and misleading statements and omissions in its privacy policies set forth above, including the statements and omissions recited in the claims below;

    b. the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Meta.

315. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiff's and Class Members' property:

    a. property rights to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes; and

    b. property rights to determine who has access to their computing devices.

316. Defendant acted with the intent to defraud in that it willfully invaded and took Plaintiff's and Class Members' property:

    a. with knowledge that (1) Defendant did not have the right to share such data without written authorization; (2) courts had determined that a healthcare providers' use of the Meta Pixel gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable Facebook user would not understand that Meta was collecting their Private Information based on their activities on Defendant's Websites; (4) "a reasonable Facebook user would be shocked to realize" the extent of Meta's collection of Private Information; (5) a Covered Incident had occurred which required a report to be made to the FTC pursuant to Meta's consent decrees with the FTC and (6) the subsequent use of health information for advertising was a further invasion of such property rights in making their own exclusive use of their Private Information for any purpose not related to the provision of their healthcare; and

**CLASS ACTION COMPLAINT**

b. with the intent to (1) acquire Plaintiff's and Class Members' Private Information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; (2) use Plaintiff's and Class Members' Private Information without their authorization and (3) gain access to Plaintiff's and Class Members' personal computing devices through the 'fbp' cookie disguised as a first-party cookie.

317.    A person who violates § 2511(1)(a) is liable for $10,000 in statutory damages to any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used.

318.    As a direct and proximate result of Defendant's violation of the ECPA, Plaintiff and Class Members were damaged by Defendant's conduct.

319.    Based on the foregoing, Plaintiff and Nationwide Class Members seek all other relief as the Court may deem just and proper, including all available monetary relief, injunctive and declaratory relief, any applicable penalties, and reasonable attorneys' fees and costs.

## COUNT II
## COMMON LAW INVASION OF PRIVACY—INTRUSION UPON SECLUSION
### (On behalf of Plaintiff & the Nationwide Class)

316.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of herself and the proposed Class.

317.    The highly sensitive and personal Private Information of Plaintiff and Class Members consists of private and confidential facts and information regarding Plaintiff's and Class Members' fertility health that were never intended to be shared beyond private communications on Defendant's Website and the consideration of health professionals.

318.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communication platforms and services therein.

66

**CLASS ACTION COMPLAINT**

319.    Plaintiff and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Defendant to receive and that they understood Defendant would keep private.

320.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

321.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class members' privacy because Defendant facilitated Facebook's simultaneous eavesdropping and wiretapping of confidential communications.

322.    Plaintiff and Class Members had a reasonable expectation of privacy because Defendant's Website Privacy Policy states that they can expect such privacy. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of private medical information coupled with individually identifying information is highly offensive to the reasonable person.

323.    Defendant failed to protect Plaintiff's and Class members' Private Information and acted knowingly when it installed the Meta Pixel onto its Website because the purpose of the Pixel is to track and disseminate individual's communications on the Website for the purpose of marketing and advertising.

324.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

325.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

326.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and in the possession of Facebook and other unauthorized third parties, and the

1  wrongful disclosure of the Private Information cannot be undone.

2      327.   Plaintiff and Class Members seek appropriate relief for these injuries,

3  including but not limited to damages that will reasonably compensate Plaintiff and Class

4  Members for the harm to their privacy interests as a result of the intrusion(s) upon Plaintiff's

5  and Class Members' privacy.

6      328.   Plaintiff and Class Members are also entitled to punitive damages resulting

7  from the malicious, willful, and intentional nature of Defendant's actions, directed at

8  injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages

9  are needed to deter Defendant from engaging in such conduct in the future.

10                    **COUNT III**

11  **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
     **(On behalf of Plaintiff & the Nationwide Class)**
12

13      329.   Plaintiff repeats the allegations contained in the paragraphs above as if fully

14  set forth herein and brings this count on behalf of herself and the proposed Class.

15      330.   Defendant solicited and invited Plaintiff and Class Members to provide their

16  Private Information through Defendant's Website as part of its regular business practices.

17  Plaintiff and Class Members accepted Defendant's offers and provided their Private

18  Information to Defendant.

19      331.   A "special relationship" exists between Defendant and Plaintiff and Class

20  Members.

21      332.   Defendant required Plaintiff and Class Members to provide their Private

22  Information, including email addresses, phone numbers, computer IP addresses,

23  appointment information, medical insurance information, medical provider information,

24  medical histories, and other content submitted on Defendant's Website as a condition of

25  their receiving healthcare services.

26      333.   As a condition of utilizing Defendant's Website and receiving services from

27  Defendant, Plaintiff and Class Members provided their Private Information and

28
                              68
                    **CLASS ACTION COMPLAINT**

compensation for their medical care. In so doing, Plaintiff and Class Members entered into a "special relationship" with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policy and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and Class Members if their data had been breached and compromised or stolen.

334. Implicit in the agreement between Defendant and its patients was the obligation that both parties would maintain the Private Information confidentially and securely.

335. Defendant had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in their possession was used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Defendant.

336. Defendant had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

337. Additionally, Defendant implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

338. Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

339. Plaintiff and Class Members fully performed their obligations under the implied duty of good faith and fair dealing with Defendant. Defendant did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendant in the absence of their implied duties with Defendant and would have instead retained the opportunity to control their Private Information for uses other than medical treatment, billing, and benefits from Defendant.

340. Consumers of medical services value their privacy and the ability to keep confidential their Private Information associated with obtaining such services. Plaintiff and Class Members would not have entrusted their Private Information to Defendant and

entered into these implied duties with Defendant without an understanding that their Private Information would be safeguarded and protected, nor would Plaintiff and Class Members have entrusted their Private Information to Defendant in the absence of Defendant's implied promise to monitor its Website, computer systems, and networks to ensure that reasonable data security measures were adopted and maintained.

341.    Defendant breached the implied duty of good faith and fair dealing with Plaintiff and Class Members by disclosing Plaintiff's and Class Members' Private Information to unauthorized third parties, failing to properly safeguard and protect Plaintiff's and Class Members' Private Information; and violating industry standards as well as legal obligations that are necessarily incorporated into implied duties between Plaintiff, Class Members, and Defendant.

342.    Defendant's acts and omissions have materially affected the intended purpose of the duties requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

343.    As a result of Defendant's failure to fulfill the promises in these implied duties, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of diminished value.

344.    As a direct and proximate result of Defendant's above-described breach of their duty of good faith and fair dealing, Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities, the loss of control of their Private Information, disruption of their medical care and treatment, and the loss of the benefit of the bargain they had struck with Defendant. As a direct and proximate result of Defendant's above-described breach, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

1

**COUNT IV**

2

**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiff & the Nationwide Class)**

3

4      345.    Plaintiff repeats the allegations contained in the paragraphs above as if fully

5   set forth herein and brings this count on behalf of herself and the proposed Class.

6      346.    Defendant solicited and invited Plaintiff and Class Members to provide their

7   Private Information through Defendant's Website as part of its regular business practices.

8   Plaintiff and Class Members accepted Defendant's offers and provided their Private

9   Information to Defendant.

10      347.    Defendant required Plaintiff and Class Members to provide their Private

11   Information, including email addresses, phone numbers, computer IP addresses, as well as

12   information about their medical conditions and treatments, their sexual orientation, HIV

13   status, and sexual identity.

14      348.    As a condition of utilizing Defendant's Web Properties and receiving

15   services from Defendant, Plaintiff and Class Members provided their Private Information

16   and compensation for their medical care. In so doing, Plaintiff and Class Members entered

17   into contracts with Defendant by which Defendant agreed to safeguard and protect such

18   information, in its Privacy Practices and elsewhere, to keep such information secure and

19   confidential.

20      349.    Implicit in the agreement between Defendant and its patients was the

21   obligation that both parties would maintain the Private Information confidentially and

22   securely.

23      350.    Defendant had an implied duty to ensure that the Private Information of

24   Plaintiff and Class Members in their possession was used only as authorized, such as to

25   provide medical treatment, billing, and other medical benefits from Defendant.

26      351.    Defendant had an implied duty to protect the Private Information of Plaintiff

27   and Class Members from unauthorized disclosure or uses.

28

352.    Additionally, Defendant implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

353.    Plaintiff and Class Members reasonably believed and expected that Defendant complied with relevant laws and regulations and were consistent with industry standards.

354.    Plaintiff and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiff and Class Members would not have provided their confidential Private Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Private Information for uses other than medical treatment, billing, and benefits from Defendant.

355.    Consumers of medical services value their privacy and the ability to keep confidential their Private Information associated with obtaining such services. Plaintiff and Class Members would not have entrusted their Private Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected, nor would Plaintiff and Class Members have entrusted their Private Information to Defendant in the absence of Defendant's implied promise to keep their information secure and to not disclose that information to third parties.

356.    Defendant breached the implied contracts with Plaintiff and Class Members by disclosing Plaintiff's and Class Members' Private Information to unauthorized third parties, including Facebook, and violating industry standards as well as legal obligations that are necessarily incorporated into implied contract between Plaintiff, Class Members, and Defendant.

357.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Private Information in exchange for medical treatment and benefits.

358.   As a result of Defendant's failure to fulfill the promises in these implied contracts, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of diminished value.

359.   As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities, the loss of control of their Private Information, disruption of their medical care and treatment, the loss of the benefit of the bargain they had struck with Defendant, and the diminished value of their PII and PHI.

360.   As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class members are entitled to all forms of monetary compensation and injunctive relief set forth herein.

### COUNT V

### UNJUST ENRICHMENT
### (On behalf of Plaintiff & the Nationwide Class)

361.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of herself and the proposed Class.

362.   Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for their own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and Class Members conferred a benefit on Defendant in the form of monetary compensation.

363.   Plaintiff and Class Members would not have used Defendant's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

364.   Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

365.   As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

366.   The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

367.   Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received as a result of its conduct alleged herein.

## COUNT VI

### NEGLIGENCE
### (On behalf of Plaintiff & the Nationwide Class)

368.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count on behalf of herself and the proposed Class.

369.   Defendant required Plaintiff and Class Members to submit non-public personal information in order to obtain healthcare/medical products and/or services.

370.   Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class in its computer systems, Defendant owed, and continues to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect her highly sensitive Private Information from disclosure to third parties.

371.   Defendant breached this duty by failing to exercise reasonable care in

**CLASS ACTION COMPLAINT**

safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

372.    It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through its use of the Pixels and other tracking technologies would result in unauthorized third parties, such as Facebook, gaining access to such Private Information for no lawful purpose.

373.    Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship that existed between Defendant and its customers, which is recognized by statute, regulations, and the common law.

374.    In addition, Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

375.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

376.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by

the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

377.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

378.    Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information.

379.    Defendant's misconduct included the failure to (1) secure Plaintiff's and Class Members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Pixels and other tracking technologies; and (5) prevent unauthorized access to Plaintiff's and Class Members' Private Information by sharing that information with Facebook and other third parties. Defendant's failures and breaches of these duties constituted negligence.

380.    As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiff's and Class Members' Private Information, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

381.    Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted (and continue to constitute) negligence at common law.

382.    Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages, and Plaintiff and Class Members are entitled to recover those damages in an amount to be determined at trial.

**CLASS ACTION COMPLAINT**

383.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) cease sharing Plaintiff's and Class Members' Private Information with Facebook and other third parties without Plaintiff's and Class Members' express consent; and (iii) submit to future annual audits of its security systems and monitoring procedures.

## RELIEF REQUESTED

384.    Plaintiff, on behalf of herself and the proposed Classes and the Subclass, respectfully requests that the Court enter an order:

      a.    Certifying this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class and Subclass defined above;

      b.    For equitable relief, enjoining Defendant from engaging in the unlawful practices and illegal acts described herein;

      c.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

      d.    An award of damages, including but not limited to, (1) actual or statutory damages; (2) punitive damages in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) reasonable attorney fees and expenses and costs of suit; and (6) such other and further relief as the Court may deem appropriate.

**CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of themselves and the proposed Classes, demand a trial by jury for all claims asserted herein and so triable.

DATED: February 29, 2024

THE BOURASSA LAW GROUP

*/s/   Jennifer A. Fornetti*
MARK J. BOURASSA, ESQ. (NBN 7999)
JENNIFER A. FORNETTI, ESQ. (NBN 7644)
VALERIE S. CHRISTIAN ESQ. (NBN 14716)
2350 W. Charleston Blvd., Suite 100
Las Vegas, Nevada 89102

David S. Almeida (pro hac vice forthcoming)
Matthew J. Langley, (pro hac vice forthcoming)
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614
t: 312-576-3024
david@almeidalawgroup.com
matt@almeidalawgroup.com

*Attorneys for Plaintiff & the Classes*

**CLASS ACTION COMPLAINT**